# In the United States Court of Federal Claims

### OFFICE OF SPECIAL MASTERS
### No. 21-2086V

| | |
|---|---|
| MORGAN FRITZ, | Chief Special Master Corcoran |
| Petitioner, | Filed: August 29, 2024 |
| v. | |
| SECRETARY OF HEALTH AND HUMAN SERVICES, | |
| Respondent. | |

*David John Carney, Green & Schafle, LLC, Philadelphia, PA, for Petitioner.*

*Colleen Clemons Hartley, U.S. Department of Justice, Washington, DC, for Respondent.*

### RULING ON ENTITLEMENT AND DECISION AWARDING DAMAGES[1]

On October 27, 2021, Morgan Fritz filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that she suffered a shoulder injury related to vaccine administration ("SIRVA") caused by an influenza ("flu") vaccine administered on November 2, 2020. Petition at 2. The case was assigned to the Special Processing Unit of the Office of Special Masters (the "SPU"). For the reasons described below I find that Petitioner is entitled to compensation, and I award **$55,000.00**, **for past pain and suffering.**

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

## I.    Relevant Procedural History

Along with her petition, Petitioner filed her vaccine administration record, medical records, and affidavit, followed by a statement of completion. ECF Nos. 5, 7. This case was then activated and assigned to SPU. ECF No. 10. In April 2023, Respondent expressed a willingness to engage in settlement discussions; however, the parties' efforts to informally resolve this matter were ultimately unsuccessful. ECF Nos. 22, 24-25

On August 14, 2023, Petitioner filed her Motion for a Ruling on the Record and Brief in Support of Damages. Mot., ECF No. 27. Petitioner argues that she has met the Act's six-month severity requirement and has otherwise established entitlement to compensation for a SIRVA Table Injury. *See id.* Petitioner requests an award of $65,000.00 for pain and suffering. *Id.* at 1.

Respondent filed a brief in reaction on September 21, 2023, arguing that Petitioner has not established she is entitled to compensation for a Table SIRVA, because she cannot show that onset of her alleged injury occurred within 48 hours of the subject vaccination. Resp. at 6-7, ECF No. 29. In the event Petitioner is found entitled to compensation, Respondent contends that the damages award should be no greater than $47,500.00. *Id.* at 1. Petitioner filed a Reply on October 5, 2023, maintaining her earlier arguments. Reply, ECF No. 30. The matter is now ripe for resolution.

## II.    Petitioner's Medical Records

Petitioner has a previous medical history of sacroiliac ("SI") joint pain and left knee pain – but no history of right shoulder pain or dysfunction. Ex. 3 at 7-24. On November 2, 2020, at age forty, Petitioner received the subject flu vaccine in her right shoulder. Ex. 1. At the time of vaccination, Petitioner worked on her family farm. Ex. 2.

On December 18, 2020, Petitioner had an appointment with Kentucky Orthopedics and Spine for her pre-existing SI joint and left knee pain. Ex. 3 at 24-25. There is no mention of right shoulder pain at this visit. *See id.*

Less than two months post-vaccination (58 days), on December 30, 2020, Petitioner returned to Kentucky Orthopedics complaining of right shoulder pain. Ex. 3 at 26. Petitioner reported "[s]he had a flu shot on her [sic] second [sic] she had tremendous amount of pain in the shoulder following that. She has had pain since then." *Id.* She also reported difficulty lifting her arm overhead. *Id.* An x-ray performed that day showed a "type II acromion with mild [acromioclavicular ("AC")] joint arthritis." *Id.* at 27. Following an examination, Petitioner was diagnosed with right rotator cuff tendinitis and impingement.

*Id.* The orthopedist recommended physical therapy ("PT"), a steroid injection, and to remain off work. *Id.* On January 13, 2021, Petitioner received a cortisone injection in the right shoulder. *Id.* at 28.

Petitioner underwent her initial PT evaluation on January 19, 2021. Ex. 6 at 29. Petitioner reported the "onset of [right] shoulder pain following flu shot Nov. 2. She notes the injection was painful and she felt that is [sic] was placed too far superiorly." *Id.* Petitioner explained her "[s]oreness persisted . . . for 1 month following injection" and beyond – with exacerbation from work activities. *Id.* Petitioner rated her pain as a 0/10 at rest but a 3/10 with carrying, lifting, sleeping, reaching or extension, and undressing. *Id.* She described the pain as "aching local to lateral shoulder with [] one episode of popping with referred pain into brachium." *Id.* The physical therapist noted that Petitioner was off work due to her injury. *Id.* Additional PT was recommended. *Id.* at 30.

Two weeks after her steroid injection, Petitioner had a follow-up appointment with her orthopedist. Ex. 3 at 32. The orthopedist noted that Petitioner's right shoulder pain "started from a flu shot in November" and "at this point she is improving" but still was experiencing some pain. *Id.* at 32-33. An examination showed tenderness to the right deltoid and slightly decreased range of motion ("ROM") with flexion and abduction. *Id.* at 32. Although the steroid injection Petitioner received "helped significantly," Petitioner's orthopedist opined that she experienced a "hyperinflammatory" type reaction to the vaccination and that it would resolve with additional PT. *Id.* at 33.

Petitioner had another follow-up with her orthopedist on February 24, 2021. Ex. 4 at 3. The orthopedist found Petitioner to have a 50% improvement in her right shoulder. *Id.* He reiterated that Petitioner's pain "started from an injection to her right shoulder with a flu shot. She has had some persistent symptoms." *Id.* In addition to PT, Petitioner reported taking ibuprofen and a muscle relaxer, which is noted as being "mainly for SI joint[;]" she was also off work. *Id.* A physical examination showed "some tenderness to her deltoid area" and slightly improved ROM. *Id.* Petitioner was assessed with "right shoulder pain with myositis." *Id.* The orthopedist prescribed a Medrol dosepak, additional PT, and told Petitioner to forego work for an additional two weeks – after which time the orthopedist "anticipate[d Petitioner] returning to work." *Id.* at 4.

Petitioner attended eight PT sessions between January 19 – March 9, 2021. Ex. 6 at 28-60. During her March 9th session, the physical therapist noted that Petitioner had good tolerance to sessions and was showing improvement with minimal complaints of pain. *Id.* at 60. She reported "soreness in [her] biceps from pulling [a] calf." *Id.* at 58. A physical examination revealed diminished active and passive ROM and reduced abduction and flexion. *Id.* The plan was to continue PT. *Id.* at 60.

On March 10, 2021, Petitioner had a follow-up with her orthopedist for her right shoulder pain. Ex. 4 at 5. The orthopedist noted that Petitioner is doing "somewhat better. She is 56-60% improved." *Id.* He also noted Petitioner had a recent "exacerbation of symptoms following the delivery of two calves." *Id.* The orthopedist maintained his assessment and Petitioner was ordered to continue with an anti-inflammatory, PT, and to avoid overhead activities. *Id.* at 4-5.

Petitioner had two additional follow up appointments with her orthopedist on April 7 and 27, 2021, during which she reported improvement in her shoulder symptoms. Ex. 5 at 6, 8. Indeed, by April 7, 2021, Petitioner noted she was "doing very well" and was able to perform activities of daily living ("ADLs") and other activities associated with her work on the farm. *See id.* at 6. On April 27, 2021, the orthopedist noted Petitioner's "right shoulder pain is definitely improving since her last visit . . . . No new problems in this regard." *Id.* at 8. Still, during her physical examination, Petitioner exhibited "decreased right rotator cuff strength due to pain" and positive impingement signs. *Id.* No plan of treatment was noted pertaining to Petitioner's right shoulder. *Id.* at 9.

Petitioner attended her last follow up appointment with her orthopedist on July 6, 2021.[3] Ex. 5 at 14. Petitioner reported "significant improvement" but noted that she experiences "popping sensations [that] are painful." *Id.* The orthopedist wrote that Petitioner had a "history of myositis post influenza vaccine injection. She is seeing considerable improvement in terms of her ADLs." *Id.* Petitioner exhibited full ROM but positive impingement signs upon examination. *Id.* The orthopedist assessed Petitioner with "right shoulder scapula dyskinesis with impingement, improving." *Id.* at 15. A home-exercise program ("HEP") was recommended, and Petitioner was told to follow up as needed. *Id.* No additional medical records have been filed.

### III.    Affidavit Evidence

In an affidavit signed on October 4, 2021, Petitioner attests that upon receiving the subject vaccination, she noticed that "the person administering it gave it to [her] in a higher spot than [she] had received in the past." Ex. 2 ¶ 9. She continues, "[b]y that evening," her shoulder was in "severe pain." *Id.* Petitioner notes that her daughter received a flu shot simultaneously with Petitioner, and while her daughter's pain "completely subsided" two-to-three days post vaccination, Petitioner's did not. *Id.* She explains that "[a]t this point," she was experiencing "constant, dull, and aching pain[.]" *Id.* When she continued

---

[3] Between Petitioner's March 9 and July 6, 2021 visits, on May 5, 2021, she underwent SI joint surgery. Ex. 5 at 10-15.

to experience "severe" shoulder pain with work and home chores to the point that she could "no longer do either," she sought formal treatment in December. *Id.* ¶ 10.

Petitioner attests that she was out of work at her family farm from December 11, 2020, to April 7, 2021, "when [her] shoulder had returned to about 80% of what is was before." Ex. 2 ¶ 14. She notes this added a "financial strain" on her family. *Id.* Petitioner states that her job requires daily chores, feeding, lifting, cleaning, and caring for animals – for which she now requires assistance or alterations "so that [the activities] do not irritate [her] shoulder." *Id.* ¶ 13.

She currently experiences right shoulder pain and decreased ROM when she attempts to use her shoulder for ADLs, including "laundry, dishes, changing clothes, and even bathing[.]" Ex. 2 ¶ 15. Petitioner also describes pain when she sleeps on her right side or with lifting "in certain directions." *Id.* She continues to perform her HEP to address her ongoing right shoulder symptomology. *Id.* ¶ 16.

## IV.    Fact Findings and Ruling on Entitlement

Pursuant to Vaccine Act Section 13(a)(1)(A), a petitioner must prove, by a preponderance of the evidence, the matters required in the petition by Vaccine Act Section 11(c)(1). In addition to requirements concerning the vaccination received, the duration and severity of petitioner's injury, and the lack of other award or settlement,[4] a petitioner must establish that she suffered an injury meeting the Table criteria, in which case causation is presumed, or an injury shown to be caused-in-fact by the vaccination she received. Section 11(c)(1)(C).

The most recent version of the Table, which can be found at 42 C.F.R. § 100.3, identifies the vaccines covered under the Program, the corresponding injuries, and the time period in which the particular injuries must occur after vaccination. Section 14(a). Pursuant to the Vaccine Injury Table, a SIRVA is compensable if it manifests within 48 hours of the administration of an influenza vaccine. 42 C.F.R. § 100.3(a)(XIV)(B). A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:

(i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged

---

[4] In summary, a petitioner must establish that she received a vaccine covered by the Program, administered either in the United States and its territories or in another geographical area but qualifying for a limited exception; suffered the residual effects of her injury for more than six months, died from her injury, or underwent a surgical intervention during an inpatient hospitalization; and has not filed a civil suit or collected an award or settlement for her injury.  *See* § 11(c)(1)(A)(B)(D)(E).

signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;

(ii) Pain occurs within the specified time frame;

(iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and

(iv) No other condition or abnormality is present that would explain the patient's symptoms (*e.g.*, NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10).

A special master must consider, but is not bound by, any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record. Section 13(b)(1). "Medical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Accordingly, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Hum. Servs.*, No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). However, the Federal Circuit has recently "reject[ed] as incorrect the presumption that medical records are always accurate and complete as to all of the patient's physical conditions." *Kirby v. Sec'y of Health & Hum. Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021). Medical professionals may not "accurately record everything" that they observe or may "record only a fraction of all that occurs." *Id.*

Medical records may be outweighed by testimony that is given later in time that is "consistent, clear, cogent, and compelling." *Camery v. Sec'y of Health & Hum. Servs.*, 42 Fed. Cl. 381, 391 (1998) (citing *Blutstein v. Sec'y of Health & Hum. Servs.*, No. 90-2808, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998). The credibility of the individual offering such testimony must also be determined. *Andreu v. Sec'y of Health & Hum. Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Hum. Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

### A. Factual Findings Regarding a Table SIRVA

After a review of the entire record, I find that a preponderance of the evidence demonstrates that Petitioner has satisfied the QAI requirements for a Table SIRVA.

#### 1. Petitioner Had No Prior Left Shoulder Condition or Injury that would Explain her Symptoms

The first requirement for a Table SIRVA is a lack of problems associated with the affected shoulder prior to vaccination that would explain the subsequent symptoms. 42 C.F.R. § 100.3(c)(10)(i). Respondent does not dispute that Petitioner meets this criterion. I find that she has demonstrated a lack of history of pain, inflammation, or dysfunction of her right shoulder that would explain her symptoms.

#### 2. Onset of Petitioner's Injury Occurred within Forty-Eight Hours of her Vaccination

A petitioner alleging a SIRVA claim must also show that she experienced the first symptom or onset within 48 hours of vaccination (42 C.F.R. § 100.3(a)(XIV)(B)), and that her pain began within that same 48-hour period (42 C.F.R. § 100.3(c)(10)(ii) (QAI criteria)). Respondent questions whether Petitioner can establish this criterion. Nonetheless, the medical records preponderantly establish onset of injury close-in-time to vaccination and specifically within 48 hours of the subject vaccination.

Although her first recorded post-vaccination complaint of shoulder pain linked to the flu vaccine occurred on December 30, 2020 (58 days post-vaccination), Petitioner specifically stated at this time that she "had a flu shot on her [sic] second [sic] she had tremendous amount of pain in the shoulder following that. She has had pain since then." Ex. 3 at 26. The single intervening medical visit before this date was for pre-existing and unrelated SI joint and knee issues. Petitioner could have reasonably mentioned shoulder-related complaints during this visit (as it was with her orthopedist whom she saw for musculoskeletal issues), but her failure to do so on one occasion does not alone preclude a finding of Table-consistent onset.

Petitioner's treatment delay itself also does not undermine her onset assertions. It is common for SIRVA petitioners to delay seeking treatment, thinking the injury will resolve on its own, especially since patients are often told by medical providers at the time of vaccination to expect some soreness and pain for a period of time after. And individuals also often misconstrue the nature of their injury, and therefore fail to inform treaters of all specific facts relevant to onset until later.

Indeed, I have found *greater* delays not to have undermined an otherwise-preponderantly-established showing of two-day onset. *See, e.g., Tenneson v. Sec'y of Health & Hum. Servs.*, No. 16-1664V, 2018 WL 3083140, at *5 (Fed. Cl. Spec. Mstr. Mar. 30, 2018), *mot. for rev. denied,* 142 Fed. Cl. 329 (2019) (finding a 48-hour onset of shoulder pain despite a nearly six-month delay in seeking treatment); *Williams v. Sec'y of Health & Hum. Servs.*, No. 17-830V, 2019 WL 1040410, at *9 (Fed. Cl. Spec. Mstr. Jan. 31, 2019) (noting a delay in seeking treatment for five-and-a-half months because a petitioner underestimated the severity of her shoulder injury). At most, the delay speaks to the separate issue of the degree of Petitioner's pain and suffering – for her injury appears to have been manageable, with largely home-remedies for nearly two months before professional medical assistance was sought.

Additionally, Petitioner affirmatively and repeatedly linked the onset of her shoulder pain to the November 2, 2020 flu vaccine. *See,* e.g., Ex. 6 at 29 (a January 19, 2021 PT note reporting the "onset of [right] shoulder pain following flu shot Nov. 2."); Ex. 3 at 32 (a January 27, 2021 orthopedic note stating pain "started from a flu shot in November"); Ex. 4 at 3 (a February 24, 2021 orthopedic note that Petitioner's pain "started from injection to her right shoulder with a flu shot"). Furthermore, the affidavit submitted by Petitioner corroborates the evidence contained in her medical records, that her shoulder pain began the day of her vaccination. Ex. 2. Accordingly, there is preponderant evidence that establishes the onset of Petitioner's right shoulder pain more likely than not occurred within 48-hours of vaccination.

### 3. Petitioner's Pain was Limited to her Right Shoulder

The third QAI requirement for a Table SIRVA requires a petitioner's pain and reduced range of motion to be "limited to the shoulder in which the intramuscular vaccine was administered." 42 C.F.R. § 100.3(c)(10)(iii). Petitioner's pain was limited to her right shoulder. Respondent does not contest this aspect of Petitioner's claim, and there is nothing in the records to suggest otherwise.

### 4. There is No Evidence of Another Condition or Abnormality

The last criteria for a Table SIRVA state that there must be no other condition or abnormality which would explain a petitioner's current symptoms. 42 C.F.R. § 100.3(c)(10)(iv). Respondent does not contest this aspect of Petitioner's claim, and there is nothing in the records to suggest that any such condition or abnormality exists.

### B. Other Requirements for Entitlement

In addition to establishing a Table injury, a petitioner must also provide preponderant evidence of the additional requirements of Section 11(c). Respondent does not dispute that Petitioner has satisfied these requirements in this case, and the overall record contains preponderant evidence to fulfill these additional requirements.

The record shows that Petitioner received a flu vaccine intramuscularly on November 2, 2020, in the United States. Ex. 2; *see* Section 11(c)(1)(A) (requiring receipt of a covered vaccine); Section 11(c)(1)(B)(i)(I) (requiring administration within the United States or its territories). There is no evidence that Petitioner has collected a civil award for her injury. Ex. 2; Section 11(c)(1)(E) (lack of prior civil award). Additionally, Petitioner has suffered the residual effects of her shoulder injury for more than six months. *See* Section 11(c)(1)(D)(i) (statutory six-month requirement).

Based upon all of the above, Petitioner has established that she suffered a Table SIRVA – albeit a limited and extremely mild form of the injury. Additionally, she has satisfied all other requirements for compensation. I therefore find that Petitioner is entitled to compensation in this case.

## V.    Damages

The parties have briefed damages in this case, and Petitioner's request seeks only an award for past pain and suffering - $65,000.00. Mot. at 2; Reply Br. at 1. Respondent proposes an award of no more than $47,500.00. Resp. at 1.

### A.  Legal Standards for Damages Awards

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000.00." Section 15(a)(4). Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment award such expenses which (i) resulted from the vaccine-related injury for which petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." Section 15(a)(1)(B). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Hum. Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no mathematic formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V,

2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("[a]wards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Hum. Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (quoting *McAllister v. Sec'y of Health & Hum. Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

Special masters may also consider prior pain and suffering awards to aid in determining the appropriate amount of compensation for pain and suffering in a case. *See,* e.g., *Doe 34 v. Sec'y of Health & Hum. Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case"). And, of course, I may rely on my own experience (along with my predecessor Chief Special Masters) adjudicating similar claims.[5] *Hodges v. Sec'y of Health & Hum. Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).

Although pain and suffering in the past was often determined based on a continuum, as Respondent argues, that practice was cast into doubt by the Court several years ago. *Graves v. Sec'y of Health & Hum. Servs.,* 109 Fed. Cl. 579 (Fed. Cl. 2013). The *Graves* court maintained that to do so resulted in "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly." *Id.* at 590. Instead, *Graves* assessed pain and suffering by looking to the record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program. *Id.* at 595. Under this alternative approach, the statutory cap merely cuts off *higher* pain and suffering awards – it does not shrink the magnitude of *all* possible awards as falling within a spectrum that ends at the cap. Although *Graves* is not controlling of the outcome in this case, it provides reasoned guidance in calculating pain and suffering awards.

---

[5] From July 2014 until September 2015, the SPU was overseen by former Chief Special Master Vowell. For the next four years, until September 30, 2019, all SPU cases, including the majority of SIRVA claims, were assigned to former Chief Special Master Dorsey, now Special Master Dorsey. In early October 2019, the majority of SPU cases were reassigned to me as the current Chief Special Master.

### B. Prior SIRVA Compensation Within SPU[6]

### A.      Data Regarding Compensation in SPU SIRVA Cases

SIRVA cases have an extensive history of informal resolution within the SPU. As of July 1, 2024, 4,138 SPU SIRVA cases have resolved since the inception of SPU ten years before. Compensation has been awarded in the vast majority of cases (4,016), with the remaining 122 cases dismissed.

2,308 of the compensated SPU SIRVA cases were the result of a reasoned ruling that the petitioner was entitled to compensation (as opposed to an informal settlement or concession).[7] In only 235 of these cases, however, was the amount of damages *also* determined by a special master in a reasoned decision.[8] As I have previously stated, the written decisions setting forth such determinations, prepared by neutral judicial officers (the special masters themselves), provide the most reliable guidance in deciding what similarly-situated claimants should also receive.[9]

The data for all categories of damages decisions described above reflect the expected differences in outcome, summarized as follows:

---

[6] All figures included in this decision are derived from a review of the decisions awarding compensation within the SPU. All decisions reviewed are, or will be, available publicly. All figures and calculations cited are approximate.

[7] The remaining 1,708 compensated SIRVA cases were resolved via stipulated agreement of the parties without a prior ruling on entitlement. These agreements are often described as "litigative risk" settlements, and thus represent a reduced percentage of the compensation which otherwise would be awarded. Because multiple competing factors may cause the parties to settle a case (with some having little to do with the merits of an underlying claim), these awards from settled cases do not constitute a reliable gauge of the appropriate amount of compensation to be awarded in other SPU SIRVA cases.

[8] The rest of these cases resulting in damages after concession were either reflective of a proffer by Respondent (2,044 cases) or stipulation (29 cases). Although all proposed amounts denote *some* form of agreement reached by the parties, those presented by stipulation derive more from compromise than instances in which Respondent formally acknowledges that the settlement sum itself is a fair measure of damages.

[9] Of course, even though *all* independently-settled damages issues (whether by stipulation/settlement or proffer) must still be approved by a special master, such determinations do not provide the same judicial guidance or insight obtained from a reasoned decision. But given the aggregate number of such cases, these determinations nevertheless "provide *some* evidence of the kinds of awards received overall in comparable cases." *Sakovits v. Sec'y of Health & Hum. Servs.*, No. 17-1028V, 2020 WL 3729420, at *4 (Fed. Cl. Spec. Mstr. June 4, 2020) (discussing the difference between cases in which damages are agreed upon by the parties and cases in which damages are determined by a special master).

|  | Damages Decisions by Special Master | Proffered Damages | Stipulated Damages | Stipulated[10] Agreement |
|---|---|---|---|---|
| Total Cases | *235* | *2,044* | *29* | *1,708* |
| Lowest | $35,000.00 | $10,000.00 | $45,000.00 | $2,500.00 |
| 1st Quartile | $67,910.00 | $60,539.19 | $90,000.00 | $35,000.00 |
| Median | **$85,920.03** | **$80,240.98** | **$130,000.00** | **$50,000.00** |
| 3rd Quartile | $125,066.35 | $109,681.54 | $162,500.00 | $77,500.00 |
| Largest | $1,569,302.82 | $1,845,047.00 | $1,500,000.00 | $550,000.00 |

## B.    Pain and Suffering Awards in Reasoned Decisions

In the 235 SPU SIRVA cases in which damages were the result of a reasoned decision, compensation for a petitioner's actual or past pain and suffering varied from $35,000.00 to $215,000.00, with $85,000.00 as the median amount. Only ten of these cases involved an award for future pain and suffering, with yearly awards ranging from $250.00 to $1,500.00.[11] In one of these cases, the future pain and suffering award was limited by the statutory pain and suffering cap.[12]

In cases with lower awards for past pain and suffering, many petitioners commonly demonstrated only mild to moderate levels of pain throughout their injury course. This lack of significant pain is often evidenced by a delay in seeking treatment – over six months in one case. In cases with more significant initial pain, petitioners usually experienced this greater pain for three months or less. Most petitioners displayed only mild to moderate limitations in range of motion ("ROM"), and MRI imaging showed evidence of mild to moderate pathologies such as tendinosis, bursitis, or edema. Many petitioners suffered from unrelated conditions to which a portion of their pain and suffering could be attributed. These SIRVAs usually resolved after one to two cortisone injections and two months or less of physical therapy ("PT"). None required surgery. Except in one case involving very mild pain levels, the duration of the SIRVA injury ranged from six to

---

[10] Two awards were for an annuity only, the exact amounts which were not determined at the time of judgment.

[11] Additionally, a first-year future pain and suffering award of $10,000.00 was made in one case. *Dhanoa v. Sec'y of Health & Hum. Servs.*, No. 15-1011V, 2018 WL 1221922 (Fed. Cl. Spec. Mstr. Feb. 1, 2018).

[12] *Joyce v. Sec'y of Health & Hum. Servs.*, No. 20-1882V, 2024 WL 1235409, at *2 (Fed. Cl. Spec. Mstr. Feb. 20, 2024) (applying the $250,000.00 statutory cap for actual and future pain and suffering set forth in Section 15(a)(4) before reducing the future award to net present value as required by Section 15(f)(4)(A)); *see Youngblood v. Sec'y of Health & Hum. Servs.*, 32 F.3d 552, 554-55 (Fed. Cir.1994) (requiring the application of the statutory cap before any projected pain and suffering award is reduced to net present value).

30 months, with most petitioners averaging approximately nine months of pain. Although some petitioners asserted residual pain, the prognosis in these cases was positive.

Cases with higher awards for past pain and suffering involved petitioners who suffered more significant levels of pain and SIRVAs of longer duration. Most of these petitioners subjectively rated their pain within the upper half of a ten-point pain scale and sought treatment of their SIRVAs more immediately, often within 30 days of vaccination. All experienced moderate to severe limitations in range of motion. MRI imaging showed more significant findings, with the majority showing evidence of partial tearing. Surgery or significant conservative treatment, up to 133 PT sessions - occasionally spanning several years, and multiple cortisone injections, were required in these cases. In eight cases, petitioners provided sufficient evidence of permanent injuries to warrant yearly compensation for future or projected pain and suffering.

### C. Appropriate Compensation for Pain and Suffering

In this case, awareness of the injury is not disputed, leaving only the severity and duration of the injury to be considered. In determining appropriate compensation for pain and suffering, I have carefully reviewed and taken into account the complete record in this case, including all medical records, affidavits, plus all filings submitted by both Petitioner and Respondent. I have also considered prior awards for pain and suffering in both SPU and non-SPU SIRVA cases and relied upon my experience adjudicating these cases. However, my determination is ultimately based upon the specific circumstances of this case.

Citing five prior damages determinations (*Horton, Johnson, Dagen, Russo,* and *Morrison-Langehough*),[13] Petitioner requests an award of $65,000.00, given the comparable severity. Mot. at 1, 28-33; Reply at 8-10. In particular, Petitioner emphasizes that she consistently treated her right shoulder injury for approximately eight months. *Id.* at 32. She first sought treatment on December 30, 2020, and her subsequent care was comprised of eight orthopedic visits, seven PT sessions, and one cortisone injection. *Id.* Additionally, Petitioner notes at the time of her last orthopedic visit on July 6, 2021, while her pain had significantly improved, she was still experiencing residual symptoms, including a popping sensation in her shoulder and positive impingement signs. *Id.* (citing

---

[13] *Horton v. Sec'y of Health & Hum. Servs.*, No. 20-1166V, 2022 WL 1421847 (Fed. Cl. Spec. Mstr. Mar. 25, 2022) (awarding $60,000.00 for actual pain and suffering); *Johnson v. Sec'y of Health & Hum. Servs.*, No. 18-1486V, 2021 WL 836891 (Fed. Cl. Spec. Mstr. Jan. 25, 2021) (awarding $65,000.00 for actual pain and suffering); *Dagen v. Sec'y of Health & Hum. Servs.*, No. 18-442V, 2019 WL 7187335 (Fed. Cl. Spec. Mstr. Nov. 6, 2019) (awarding $65,000.00 for actual pain and suffering); *Russo v. Sec'y of Health & Hum. Servs.,* No. 20-1491V, 2022 WL 4717927 (Fed. Cl. Spec. Mstr. Aug. 31, 2022) (awarding $63,000.00 for actual pain and suffering); *Morrison-Langehough v. Sec'y of Health & Hum. Servs.,* No. 19-1103V, 2022 WL 1863924 (Fed. Cl. Spec. Mstr. Apr. 14, 2022) (awarding $70,000.00 for actual pain and suffering).

Ex. 7 at 14). Such lingering effects require Petitioner to restrict or alter her duties on her family farm and she experiences difficulties with ADLs, including sleeping. Reply at 13 (citing Ex. 2).

Respondent argues in favor of a lower award. Resp. at 1, 8. Although Petitioner required three prescription medications, one steroid injection, and eight PT sessions over an eight-month period, Petitioner "experienced a very positive recovery" (without ongoing pain and dysfunction) and her clinical course was "extremely mild and limited in duration." *Id.* at 15-16. Respondent further asserts that Petitioner's failure to seek treatment until 58 days post vaccination, as well as her concurrent treatment for SI joint pain, should be considered in reviewing her overall treatment course. *Id.* at 16 (citing Ex. 3 at 24-25; Ex. 5 at 10-15). He thus compares the duration and severity of Petitioner's case to *Mejias v. Sec'y of Health & Hum. Servs.*, No. 19-1944V, 2021 WL 5895622 (Fed. Cl. Spec. Mstr. Nov. 10, 2021) (awarding $45,000.00 in pain and suffering) and *Piccolotti v. Sec'y of Health & Hum. Servs.*, No. 20-135V, 2023 WL 3165383 (Fed. Cl. Spec. Mstr. Mar. 31, 2023) (awarding $45,000.00 in pain and suffering).

This is a straightforward damages determination. The filed record in this case establishes that Petitioner suffered a mild SIRVA overall, with the most significant pain occurring close-in-time to onset. Particularly relevant to my decision is evidence demonstrating Petitioner's treatment within two months of her vaccination, subsequent treatment with medications (including a Medrol dosepak, anti-inflammatories/ibuprofen, and a muscle relaxer[14]), an x-ray, one corticosteroid injection (that provided significant relief), and participation in eight PT sessions – resulting in some residual effects. Additionally, when Petitioner's medical records contain descriptions of her pain on a ten-point scale, she rated her pain at a 0/10 at rest and a 3/10 with movement and certain ADLs – thus emphasizing the overall mildness of her injury. *See,* e.g., Ex. 6 at 29 (Petitioner's report during her initial PT evaluation on January 19, 2021).

Additionally, Petitioner suffered from reduced ROM that was initially reported soon after her vaccination. Indeed, her reduced ROM was documented on examination at Petitioner's first post-vaccination visit and consistently thereafter. *See,* e.g., Ex. 3 at 26 (a December 30, 2020 report of difficulties with overhead movement); Ex. 3 at 32 (a January 27, 2021 examination showing decreased ROM with flexion and abduction); Ex. 4 at 3 (a February 24, 2021 note reflecting "slightly improved" ROM but still not a return to full ROM); Ex. 6 at 58 (a March 9, 2021 PT note stating diminished active and passive ROM

---

[14] Petitioner admits that she was "mainly" taking the muscle relaxer for her comorbid SI joint pain, for which she was concurrently undergoing treatment. As such, I cannot award Petitioner's taking of a prescription muscle relaxer *much* weight in determining the degree of Petitioner's pain and suffering, however, it is still relevant to an extent.

with abduction and flexion). Yet, by Petitioner's last orthopedic follow up on July 6, 2021, the records show Petitioner exhibited "full ROM." Ex. 5 at 14. The medical records thus show that Petitioner's limitations in ROM resolved sometime between her March 9 and July 6, 2021 visits and therefore do not support Petitioner's assertions of ongoing ROM restrictions.

The record otherwise preponderantly establishes that Petitioner's treatment course and ongoing SIRVA symptoms continued for approximately eight months – through July 6, 2021, when Petitioner demonstrated impingement signs on examination. Ex. 5 at 14. Although I credit Petitioner's assertions in her affidavit that she has continued to experience *residual* symptoms of her SIRVA, including pain and limited ROM, her overall recovery has been fairly good overall – a fact supported by her lack of continued formal treatment contained in the medical records and her admitted improvement. Indeed, Petitioner's assertions in her affidavit – that she continues to perform her HEP – underscore that her lingering symptoms, although present, were manageable with conservative treatment without requiring her return to further formal treatment.

Further, the severity and duration of the injury at issue herein is distinguishable from Respondent's cited cases. In *Mejias*, the petitioner sought treatment within two days of the subject vaccination and experienced pain ranging from a 3-6/10 – thus speaking to a more significant injury. *See* 2021 WL 5895622. However, despite the *Mejias* petitioner's more severe pain and for a longer duration (over ten months), that treatment course included conservative measures (including naproxen, lidocaine patches, and acetaminophen), without *any* PT or steroid injections. *See id.* Likewise, the *Piccolotti* petitioner went to the doctor within ten days of vaccination but then treated for a similar duration to Petitioner (nine vs. eight months). *See* 2023 WL 3165383. Still, that petitioner did not undergo *any* PT treatment. *See id.* Given Petitioner's treatment with PT sessions (although limited in quantity and duration), Petitioner is entitled to a higher award than what was awarded to the petitioners in Respondent's cited cases.

The cases relied upon by Petitioner are more instructive – but the severity of Petitioner's injury does not quite warrant the $65,000.00 sum requested. Each of the petitioners in the Petitioner's cited cases sought care closer-in-time to vaccination, and they rated their pain higher on a ten-point scale throughout their courses of treatment. *See Horton v. Sec'y of Health & Hum. Servs.*, No. 20-1166V, 2022 WL 1421847 (Fed. Cl. Spec. Mstr. Mar. 25, 2022) (seeking care within 12 days of vaccination and rating pain at a 3-8/10); *Johnson v. Sec'y of Health & Hum. Servs.*, No. 18-1486V, 2021 WL 836891 (Fed. Cl. Spec. Mstr. Jan. 25, 2021) (seeking care within two days of vaccination and rating pain at a 7-8/10, decreasing to a 4-5/10, then 2/10); *Dagen v. Sec'y of Health & Hum. Servs.*, No. 18-442V, 2019 WL 7187335 (Fed. Cl. Spec. Mstr. Nov. 6, 2019)

(seeking care within 15 days of vaccination and rating pain at a 4-9/10); *Russo v. Sec'y of Health & Hum. Servs.,* No. 20-1491V, 2022 WL 4717927 (Fed. Cl. Spec. Mstr. Aug. 31, 2022) (seeking care within 16 days of vaccination and rating pain at a 6-8/10); *Morrison-Langehough v. Sec'y of Health & Hum. Servs.,* No. 19-1103V, 2022 WL 1863924 (Fed. Cl. Spec. Mstr. Apr. 14, 2022) (seeking care within 29 days of vaccination and rating pain at a 2-6/10). More so, these petitioners (with the exception of the *Russo* petitioner) had clinical findings confirmed on MRI. By contrast, Petitioner here delayed care until 58 days post vaccination, rated her pain at a 0-3/10 (at most), and did not undergo an MRI – thus speaking to a milder injury. A lower award than those awarded in Petitioner's cited cases is thus appropriate.

Still, Petitioner otherwise underwent a similar treatment course for approximately equal duration to several of the petitioners in the cases she relies upon for support and the awards thus provide helpful context. For example, the *Johnson* petitioner received one cortisone injection, attended six PT sessions, and treated for a total of six months. *See* 2021 WL 836891. Likewise, the petitioner in *Dagen* treated for a total of seven months, and the treatment included one cortisone injection and nine PT sessions. *See* 2019 WL 7187335. Both *Johnson* and *Dagen*, like Petitioner, received concurrent treatment for unrelated issues while treating for vaccine-related shoulder symptoms. More so, the *Russo* petitioner had 12 PT sessions, and, like Petitioner, treated for eight months and did not undergo an MRI. *See* 2022 WL 4717927. Nonetheless, in light of the more severe reported pain in those cases, I find a lower award is appropriate in this case.

The best comparable offered in this case involved a $60,000.00 past pain and suffering award. *See Horton*, 2022 WL 1421847. The *Horton* petitioner presented within 12 days of vaccination and treated with eight PT sessions and one cortisone injection (with significant relief similar to Petitioner) over an eight-month period. *See id.* While such treatment courses are seemingly analogous, the *Horton* petitioner had clinical findings on MRI, including tenosynovitis and bursitis, whereas Petitioner did not require an MRI. Additionally, as noted above, the *Horton* petitioner described pain rated higher on a ten-point scale compared to Petitioner (3-8/10 vs. 0-3/10). Therefore, a slightly lower sum is properly awarded in this case.

### Conclusion

**In view of the evidence of record, I find that there is preponderant evidence that the onset of Petitioner's injury, specifically shoulder pain, was within 48 hours of her vaccine. Further, based on the evidence of record, I find that Petitioner is entitled to compensation for her Table SIRVA claim.**

I also find that, for all of the reasons discussed above and based on consideration of the record as a whole, **$55,000.00 represents a fair and appropriate amount of compensation for Petitioner's actual pain and suffering.**[15]

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master

---

[15] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.